IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GARRY SHULER and BARBARA PANUSH, husband and wife,<br><br>Appellants,<br><br>v.<br><br>TIMOTHY L. BENNECKER and EDITH T. KROHA, husband and wife,<br><br>Respondents. | No. 87075-1-I<br><br>DIVISION ONE<br><br>ORDER GRANTING MOTION FOR LIMITED RECONSIDERATION AND WITHDRAWING AND SUBSITUTING OPINION |

Respondents Timothy Bennecker and Edith Kroha filed a motion for limited reconsideration of the opinion filed on February 24, 2025 in the above case. Appellants Gary Shuler and Barbara Panush filed a response. A majority of the panel has determined that the motion should be granted and that the opinion filed on February 24, 2025 shall be withdrawn and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that the motion for limited reconsideration is granted and the opinion filed on February 24, 2025 shall be withdrawn and substituted opinion shall be filed.

FOR THE COURT:

_____ Chung, J.

_____, ACJ

_____ Smith, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| GARRY SHULER and BARBARA PANUSH, husband and wife,<br><br>Appellants,<br><br>v.<br><br>TIMOTHY L. BENNECKER and EDITH T. KROHA, husband and wife,<br><br>Respondents. | No. 87075-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Garry Shuler and Barbara Panush (collectively "Shuler-Panush") filed suit against Timothy Bennecker and Edith Kroha (collectively "Bennecker-Kroha") relating to a dispute about stormwater flooding that impacted both properties. After mediation, the parties entered into a settlement agreement, pursuant to which Bennecker-Kroha were responsible for hiring an engineer to design a solution and for paying all costs associated with the design and construction. Shuler-Panush rejected the proposed design. Bennecker-Kroha claimed this rejection breached the settlement agreement. Both parties separately moved for summary judgment, and the trial court granted summary judgment in favor of Bennecker-Kroha. Shuler-Panush timely appeals. Because there are genuine issues of material fact as to whether Shuler-Panush's rejection was reasonable, we reverse.

FACTS

Shuler-Panush and Bennecker-Kroha live on neighboring properties in Mason County, Washington. Pre-dating Shuler-Panush's ownership of their property, a series of pipes carried stormwater from their property and collected it in catch basin #2 on the Bennecker-Kroha property. The existing stormwater system that drained from the Shuler-Panush property was often overwhelmed by storms and would cause flooding on both parties' properties. Bennecker-Kroha alleged that on one occasion the flooding was significant and required them to "keep up with the overburdened system [by] using a gasoline-powered water pump," and on several occasions their "crawlspace and septic systems were overwhelmed and flooded."

In January 2020, Bennecker-Kroha plugged a drainpipe, preventing stormwater from the Shuler-Panush parcel from entering catch basin #2 on Bennecker-Kroha's property. Around that time, Shuler-Panush noticed there was "an unusual amount of stormwater flooding" on their property. In August 2020, Shuler-Panush filed a complaint against Bennecker-Kroha alleging waste, trespass, private nuisance, and prescriptive easement, and sought to enjoin Bennecker-Kroha from obstructing the drainpipe that carried water from the Shuler-Panush property.

In October 2021, after Shuler-Panush filed a motion for a preliminary injunction, the parties entered into a stipulation and agreed order. Bennecker-Kroha acknowledged that on October 2, "Bennecker removed a cap that he had previously installed over a stormwater conveyance pipe that discharges to the

stormwater catch basin." Bennecker-Kroha agreed not to take any action to "obstruct or block" the catch basin on their property during the pendency of the lawsuit, and based on the parties' stipulation, the court enjoined Bennecker-Kroha from doing so.

In November 2021, the parties agreed to mediate their claims. The parties came to an agreement and signed an amended settlement agreement in May 2022. In pertinent part, the agreement required as follows:

> B. Bennecker-Kroha agree to hire and pay all fees and costs associated with a stormwater engineering design from Vector Engineering, Inc. to design improvements and/or a new stormwater conveyance system over and across the Shuler-Panush Property and the Bennecker-Kroha Property . . .
>
> C. Shuler-Panush and Bennecker-Kroha shall each have the right to review and approve or disapprove of the Vector Engineering, Inc. designed improvements and/or new stormwater conveyance system, which approval shall not be unreasonably withheld;
>
> D. If the Vector Engineering, Inc. designed improvements and/or new stormwater conveyance system is approved by Bennecker-Kroha and Shuler-Panush, then Bennecker-Kroha agrees to pay all fees and costs, including but not limited to all construction costs, permits, and local, state or federal approvals, to install and/or implement the recommendations and design improvements from Vector Engineering Inc., . . .

Also, pursuant to the settlement agreement, Bennecker-Kroha hired and paid Thornton Land Surveying to conduct a topographical survey of the stormwater system. This topographical survey was provided to Kyle Freeman, an engineer with Vector Engineering, Inc. (Vector).

Vector proposed a design that would utilize the existing pipes and catch basins on the Bennecker-Kroha property to accommodate nearly 50 percent of the stormwater flow and divert the remaining 50 percent through a split in the

piping to a discharge near the beach on the Shuler-Panush property. According to Freeman, portions of Vector's proposed design would carry stormwater over and across the Shuler-Panush property to the Bennecker-Kroha property, as the settlement agreement required.

On December 3, 2022, through their counsel, Bennecker-Kroha provided Shuler-Panush with the proposed design. Shuler-Panush confirmed their receipt and asked if there were "any documents or emails from the engineer regarding the system design." On December 8, Bennecker-Kroha responded with "a description of the project":

> The concept plan proposed includes splitting the system into two separate systems with one being on 3181 and the second collecting 3193 and 3191.[1] System modifications include cutting and capping the pipe connection between existing catch basins #1 & 2 . . . , cutting and capping an existing French drain that drains to CB #2, and installing a new French drain, catch basin and outfall on the property at 3191. Our calculations indicate that this will provide a fairly even split of the drainage system, i.e. an approximate 50% reduction of the drainage amount directed to the outfall at 3181.

Shuler-Panush informed Bennecker-Kroha that they wanted to communicate with Vector regarding questions they had about the proposed design.

Subsequently, on January 17, 2023, Shuler-Panush attempted to contact Vector but were told that Bennecker-Kroha had instructed Vector not to speak with them. On January 24, Bennecker-Kroha directed Shuler-Panush to submit written questions for them to pass along to Vector. On February 6, Bennecker-Kroha asked whether Shuler-Panush would be submitting questions. On

---

[1] Property 3181 is the Bennecker-Kroha parcel, Property 3191 is the Shuler-Panush parcel, and Property 3193 is non-party Delaney's parcel. Catch basin #1 was located on the Delaney parcel.

February 22, Bennecker-Kroha again reached out, stating, "You said you were going to send written questions, but it's been 'radio silence.' Are we still on track?" That same morning, Shuler-Panush responded that they did not say they would be sending written questions and instead, would be sending "separate correspondence detailing the Shulers' rejection of the proposed stormwater design." On April 19, Shuler-Panush formally rejected Vector's proposed design, claiming that they would not agree to a system that "solely impacts and burdens their property," because they had previously rejected such a proposal in mediation. Shuler-Panush also cited Bennecker-Kroha's direction to Vector not to communicate with Shuler-Panush as inhibiting them from seeking clarification.

In June 2023, Bennecker-Kroha filed a supplemental counterclaim to Shuler-Panush's original complaint alleging that Shuler-Panush's rejection of Vector's proposed design was unreasonable because their cited reasons for withholding approval were not valid under the settlement agreement and, therefore, Shuler-Panush were in breach. Shuler-Panush filed an answer and their own supplemental claims[2] that Bennecker-Kroha were in breach because the proposed design failed to meet the requirements of the settlement agreement, they blocked Shuler-Panush from communicating directly with Vector, and they failed to act in good faith by directing Vector to consider only

---

[2] The parties stipulated that each could file these supplemental claims and counterclaims regarding the settlement agreement. The court also later granted Bennecker-Kroha's motion to bifurcate the original claims that had been mediated, resulting in the settlement agreement, from the supplemental claims regarding the settlement agreement.

their interests.[3] Shuler-Panush sought specific enforcement of the agreement and a declaratory judgment that their rejection was reasonable. Bennecker-Kroha then moved for summary judgment, claiming Shuler-Panush's stated rejection of the proposed design was unreasonable. Shuler-Panush filed a cross-motion seeking summary judgment in their favor on their supplemental claims.

On December 18, 2023, the trial court granted Bennecker-Kroha's motion for summary judgment and ordered Shuler-Panush to implement the settlement agreement and allow for construction of the proposed design. The trial court also awarded Bennecker-Kroha attorney fees and costs.

ANALYSIS

On appeal, Shuler-Panush challenges the trial court's decision to grant summary judgment. Alternatively, they ask this court to hold the trial court erred by denying their motion for summary judgment against Bennecker-Kroha. Both parties seek attorney fees and costs on appeal.

I.      Grant of Summary Judgment

We review orders granting summary judgment de novo. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). This requires the reviewing court to consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Id. We may affirm a summary judgment order on any basis that is supported by the record. Davidson Serles & Assocs. v. City of Kirkland, 159 Wn. App. 616, 624, 246 P.3d 822 (2011).

---

[3] In their answer to Bennecker-Kroha's supplemental counterclaims, Shuler-Panush alleged that the proposal was provided after the deadline in the settlement agreement and that the design was not feasible and would not be approved by Mason County. However, Shuler-Panush do not raise these issues on appeal.

According to CR 56(c), summary judgment is appropriate when "there is no genuine issue as to any material fact," meaning the moving party is entitled to judgment as a matter of law. A "material fact" exists when it impacts the outcome of the litigation. Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). Further, there is a genuine issue of material fact when "the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Keck, 184 Wn.2d at 370.

The party moving for summary judgment has the initial burden of showing the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A defendant moving for summary judgment can submit affidavits to demonstrate that no issue of material fact exists or can demonstrate to the trial court that the plaintiff lacks competent evidence to support an essential element of their case. Id. at 225-26. When the moving party is the defendant and the defendant-movant satisfies their initial burden, the burden then shifts to the plaintiff. Id. at 225. The plaintiff must sufficiently demonstrate "the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." Id. The failure to make such showing will result in the trial court granting summary judgment. Id.

Both Bennecker-Kroha's and Shuler-Panush's motions for summary judgment focused on the issue of whether Shuler-Panush's rejection of the

proposed design was reasonable.[4] Shuler-Panush characterize their rejection as based on "both procedural and substantive grounds." They claim Bennecker-Kroha acted in bad faith in the design process. Specifically, they assert that the agreement required a system that ran "over and across" both properties; that Bennecker-Kroha knew from the mediation that Shuler-Panush would not accept a system built entirely on their property; and yet they provided a "threadbare design proposal" that did exactly that. Further, Bennecker-Kroha restricted communication with Vector, inhibiting Shuler-Panush's ability to discuss the design, feasibility, and impacts with Vector and interfering with their right to review and approve the design. Shuler-Panush also claim Bennecker-Kroha put their goals for the design ahead of the purpose of the settlement agreement, which they contend was to benefit both parties.

The primary purpose of contract interpretation is to determine the parties' intent. Wilkinson v. Chiwawa Communities Ass'n, 180 Wn.2d 241, 250, 327 P.3d 614 (2014). A contract is interpreted as a question of law when reasonable minds could reach only one conclusion about the parties' intent. Id. at 250. A settlement agreement is a contract. McGuire v. Bates, 169 Wn.2d 185, 188, 234 P.3d 205 (2010). Settlement agreements are interpreted as a whole, meaning the language of a provision is interpreted in the context of other provisions. C.A. Carey Corp. v. City of Snoqualmie, 29 Wn. App. 2d 890, 907, 547 P.3d 247

---

[4] Bennecker-Kroha's motion requested summary judgment because "[t]he agreement precludes Shuler from withholding approval on the grounds he has offered because those grounds are unreasonable." Shuler-Panush's brief in response to Bennecker-Kroha's summary judgment motion and their cross-motion likewise focused on the same issue, stating, "The only issue before the Court on this motion is: Whether Plaintiffs' rejection of the split design was reasonable . . . ."

8

(2024). We can ascertain the parties' intent by determining the "objective manifestations of the agreement." Condon v. Condon, 177 Wn.2d 150, 162, 298 P.3d 86 (2013).

Moreover, every contract conveys an implied duty of good faith and fair dealing, which requires the parties to "perform in good faith the obligations imposed by their agreement." Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty also requires " 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " Edmonson v. Popchoi, 172 Wn.2d 272, 280, 256 P.3d 1223 (2011) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (AM. LAW INST. 1981)). Furthermore, the duty is not free-floating, but "arises only in connection with terms agreed to by the parties." Badgett, 116 Wn.2d at 569. Therefore, the duty cannot add to or contradict the express terms of a contract, and a party is not obligated to accept a material change to a term to avoid breach. 134th St. Lofts, LLC v. iCap Nw. Opportunity Fund, LLC, 15 Wn. App. 2d 549, 562, 479 P.3d 367 (2020).

Here, as noted above, while the parties' settlement agreement made Bennecker-Kroha responsible for certain aspects of the project, it also states that the parties "shall each have the right to review and approve or disapprove of the Vector Engineering, Inc. designed improvements and/or new stormwater conveyance system." Crucially, this provision also states that approval "shall not be unreasonably withheld." The settlement agreement does not define reasonableness. Words used in a settlement agreement are "given their ordinary,

9

usual, and popular meaning," absent contrary intent. Condon, 177 Wn.2d at 163. The reasonableness of a party in withholding consent is a question of fact "to be measured by the action which would be taken by a reasonable [person] in like circumstances." Robbins v. Hunts Food & Indus., Inc., 64 Wn.2d 289, 296-97, 391 P.2d 713 (1964). "Reason, fairness, and good faith must be the guide." Id. at 296-97.

According to Shuler-Panush, the parties intended that the design benefit both properties, but the proposed design did not conform with the agreement because it was not *a single system* to carry water "over and across" both properties.[5] On December 8, Bennecker-Kroha told them "the concept plan proposed includes splitting the system into *two separate systems*." (Emphasis added.)

Bennecker-Kroha notes the agreement states Vector would be hired "to design improvements and/or a new stormwater conveyance system"—i.e., the language "and/or" indicates that either a new system or improvements to the existing system would satisfy the agreement. Further, they contend that the settlement agreement did not require that all of the stormwater drainage from the Shuler-Panush property flow "over and across" both properties and exit solely through the existing outfall on the Bennecker-Kroha property.

---

[5] To the extent Shuler-Panush suggests that its rejection was reasonable because the design would not be approved by Mason County, as it claimed before the trial court, the only record evidence on this issue is Freeman's affidavit attesting that his proposed design "would be permitted by Mason County and is consistent with the most up-to-date guidance documents from the Department of Ecology."

The record includes Freeman's explanation that the proposed design would "separate the piping system at the property line" between the Shuler-Panush property and Bennecker-Kroha property and would "redirect drainage to an additional outfall to be located on" the Shuler-Panush property. Further, he testified that "[s]ub-drainage areas will still encroach over and across both parcels" as the settlement agreement required, while conceding this was less the result of his design and more due to natural features that existed on the property. Freeman explained that the proposed design would "provide a fairly even split of the drainage system, i.e., an approximate 50% reduction of the drainage amount directed to the original outfall at [the Bennecker-Kroha property]." This means that Freeman's proposed design would use the existing pipes and catch basins on the Bennecker-Kroha property and create a new outfall on the Shuler-Panush property.

However, at the time they rejected the proposal, Shuler-Panush had received only the first page, which they allege contained errors and lacked "any underlying data or calculations," and then Bennecker-Kroha blocked them from directly asking Vector questions to clarify those issues. On December 5, Shuler-Panush told Bennecker-Kroha they had questions about the information in the proposed design, and in response, on December 8, Bennecker-Kroha e-mailed the one-paragraph "description of the concept" but did not allow Shuler-Panush to communicate with Vector to address their questions. On January 17, Shuler-Panush emailed Bennecker-Kroha explaining that when they independently reached out to Vector, they were told that Bennecker-Kroha had directed Vector

not to speak with them and again sought to communicate with Vector. On February 23, Bennecker e-mailed Vector that Shuler-Panush's attorney "has been instructed to channel all of his questions (in writing) thru my attorney and then to me and then on to Vector Eng." At his deposition, Bennecker confirmed he directed Vector not to communicate with Shuler for the reason that "I wanted control. . . . Because [the initial design firm] withdrew . . . for some reason that I am not aware of. There was no contract placed. I wanted control, period."

Shuler-Panush subsequently rejected the design. Bennecker-Kroha claim that in rejecting the proposal, Shuler-Panush failed to explain the alleged errors in the proposed design and on appeal, fails to cite to the record, citing Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 828 P.2d 549 (1992). Bennecker-Kroha further note that Freeman testified that the errors in the proposed design were either notational errors or did not impact the outcome and functionality of the design and would be remedied before construction.

But Shuler-Panush respond that by vesting themselves with a "superior" right to communicate with Vector about their questions and concerns, Bennecker-Kroha effectively deprived Shuler-Panush of their right to review and approve the design. Even if the settlement agreement did not require that they have direct access to Vector, Shuler-Panush assert that their rejection was justified and a reasonable person in similar circumstances would have similarly found that Bennecker-Kroha's control over communication with Vector was in bad faith and inhibited Shuler-Panush's right to review the proposed design.

As Bennecker-Kroha point out, the settlement agreement was silent as to any affirmative obligation that Vector communicate directly with Shuler-Panush or access their property before completing the design proposal. They argue that Shuler-Panush could have negotiated the inclusion of such terms at mediation, but cannot now impose them. Further, Bennecker-Kroha contend that if the settlement agreement does not require the specific conduct that Shuler-Panush claims, their omissions cannot be a breach of the duty of good faith, distinguishing Edmonson, 172 Wn.2d at 279-81, in which the seller's breach of the duty of good faith was connected to an explicit term in the contract that required him to defend claims against the purchaser.

Bennecker-Kroha presented evidence through Freeman's testimony that visiting a property is not necessary to complete a design, and it is typical to have incomplete access. The settlement agreement required a topographical survey, which was completed and provided to Freeman. Freeman testified that he visited the Bennecker-Kroha property once and viewed the Shuler-Panush property from over the fence, and that the lack of access to a property impacts his designs only when "lack of access deprives me of critical information necessary for my review." Thus, it was not a breach of the settlement agreement to fail to allow Vector to access the Shuler-Panush property.

However, Shuler-Panush further assert that by giving Vector a project description and example design that focused on Bennecker-Kroha's personal goals for the design, contrary to the common purpose of a design that benefitted both parties, Bennecker-Kroha breached the agreement, and their rejection was

justified. They point to Bennecker's deposition testimony that they did not want "this design activity hijacked and changed into bigger pipes on [our] property. It was not going to happen." Bennecker-Kroha communicated with Vector to explain their preferences for the design, including that they did not want the proposed design to "dig up our property," and sought to limit contact between Shuler-Panush and Vector because they did not want "bigger pipes on [our] property." Freeman testified at his deposition that Vector was hired to "visit the site, observe the existing storm conditions, quantify the issue best to our ability, and produce a solution to mitigating and . . . reduce the impacts." When asked, "Reduce the impacts to what?", Freeman responded, "To Mr. Bennecker's property." Bennecker-Kroha told Freeman that adding drainage to their property was a "LAST choice." And when Shuler-Panush sought to engage with Vector regarding their questions about the design, Bennecker e-mailed Vector, "We will also refuse to absorb any questions from [Shuler-Panush's attorney] about why the resultant design developed the way it did (survey data driven) in terms of biased influence from myself."

Bennecker-Kroha responds that regardless of their personal preferences, the settlement agreement established the parameters of the design and Vector followed its charge. When asked whether it was necessary for him to review prior engineering reports provided by Bennecker-Kroha, Freeman responded that while he considers his client's input, he conducts his "own investigation and use[s] the information provided" to complete his own assessment.

14

While the record contains competing versions as to whether the proposed design contained errors, it is undisputed that Bennecker-Kroha restricted Shuler-Panush from communicating directly with Vector regarding their design questions, instead requiring written questions to be transmitted through Bennecker-Kroha's counsel, to Bennecker, and then to Vector. Even if the agreement did not specifically require that Shuler-Panush have direct access to Vector, this evidence creates a question of material fact as to whether Bennecker-Kroha interfered unreasonably and in bad faith with Shuler-Panush's right to obtain information necessary to review, assess, and approve the design and, therefore, whether it was reasonable for Shuler-Panush to reject the design. Thus, the trial court erred in granting Bennecker-Kroha's motion for summary judgment and holding that Shuler-Panush unreasonably withheld approval of the design within the meaning of the settlement agreement.[6]

II.     Attorney Fees

Both parties submit that they are entitled to appellate attorney fees and costs under RAP 18.1. Additionally, both parties contend that if they are the prevailing party, they should also be awarded attorney fees and costs incurred at the trial level.

A party can recover attorney fees on appeal. RAP 18.1. The party requesting fees must also "provide argument and citation to authority 'to advise the court of the appropriate grounds for an award of attorney fees as costs.' "

---

[6] Shuler-Panush argues that if we reverse the trial court's grant of summary judgment in favor of Bennecker-Kroha we should grant summary judgment in Shuler-Panush's favor. However, because there are genuine issues of material fact, resolution by summary judgment in either party's favor is not appropriate.

Robinson v. Am. Legion Dep't of Wash., Inc., 11 Wn. App. 2d 274, 298, 452 P.3d 1254 (2019) (quoting Stiles v. Kearney, 168 Wn. App. 250, 267, 277 P.3d 9 (2012)). A prevailing party is entitled to appellate attorney fees when " 'there is a contract, statute, or recognized ground in equity' " that provides for such award. Umpqua Bank v. Shasta Apts., LLC, 194 Wn. App. 685, 699, 378 P.3d 585 (2016) (quoting Thompson v. Lennox, 151 Wn. App. 479, 491, 212 P.3d 597 (2009)). When a contractual agreement contemplates an award of attorney fees at trial, it will also support an award of attorney fees on appeal. Id. at 699-700.

The parties' settlement agreement includes a provision that provides "if a party is required to bring any action to enforce this Agreement, then the prevailing party shall be entitled to its reasonable attorneys' fees and costs." Because we reverse the trial court's grant of summary judgment in favor of Bennecker-Kroha, we also reverse its award of attorney fees to Bennecker-Kroha. As we are remanding for further proceedings on the merits, a determination of the prevailing party is premature, so we deny Shuler-Panush's request for attorney fees at trial and on appeal.

## CONCLUSION

We reverse the trial court's grant of summary judgment, its dismissal of the original claims as moot, and the award of attorney fees to Bennecker-Kroha. We grant Shuler-Panush's request for costs on appeal, subject to compliance with RAP 14.4, deny their request for attorney fees on appeal, and remand for further proceedings consistent with this decision.

WE CONCUR:

Chung, J.

Brennan, J

Smith, C.J.